# Illinois Official Reports

## Appellate Court

---

**People v. Paddy, 2017 IL App (2d) 160395**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. DEREK J. PADDY, Defendant-Appellee.—THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. JESSICA D. JOHNSON, Defendant-Appellee.—THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. LEO W. COOK, Defendant-Appellee. |
| District & No. | Second District<br>Docket Nos. 2-16-0395, 2-16-0396, 2-16-0403 cons. |
| Filed | October 17, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Kane County, Nos. 15-CF-1835, 15-CF-1836, 15-CF-1834; the Hon. Donald M. Tegeler, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Joseph H. McMahon, State's Attorney, of St. Charles (Patrick Delfino, Lawrence M. Bauer, and Stephanie Hoit Lee, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.<br><br>Michael J. Pelletier, Thomas A. Lilien, and Bruce Kirkham, of State Appellate Defender's Office, of Elgin, for appellees. |

Panel                JUSTICE BURKE delivered the judgment of the court, with opinion. Justices McLaren and Schostok concurred in the judgment and opinion.

**OPINION**

¶ 1       In this consolidated appeal, the State appeals from the judgments of the circuit court of Kane County granting the motions of defendants—Derek J. Paddy, Jessica D. Johnson, and Leo W. Cook—to suppress evidence found following a dog sniff of their vehicle. Because the traffic stop was unduly prolonged, the dog sniff violated the fourth amendment. Thus, we affirm.

¶ 2                               I. BACKGROUND

¶ 3       Defendants were indicted on charges of armed violence (720 ILCS 5/33A-2(a) (West 2014)), unlawful possession of 100 grams or more but less than 400 grams of a controlled substance (heroin) with the intent to deliver (720 ILCS 570/401(a)(1)(B) (West 2014)), and unlawful possession of 100 grams or more but less than 400 grams of heroin (720 ILCS 570/402(a)(1)(B) (West 2014)). Defendants moved to suppress the evidence seized from an automobile in which Johnson was the driver and Paddy and Cook were passengers.[1]

¶ 4       The following facts are taken from the hearing on the motions to suppress. On November 11, 2015, Sergeant Ron Hain of the Kane County sheriff's department was assigned to a special operations unit conducting drug interdiction on Interstate 90. At approximately 1:18 p.m., as he drove west on I-90 near Route 47, Sergeant Hain observed a westbound Chevrolet Impala with Minnesota license plates, following a tractor-trailer. Although the Impala was traveling within the posted speed limit, it appeared to be following the tractor-trailer too closely and some of its windows were heavily tinted. Thus, Sergeant Hain decided to stop the Impala.

¶ 5       After stopping the Impala, Sergeant Hain approached the open front passenger-side window. Cook was in the front passenger seat, and Paddy was seated in the rear behind Johnson. According to Sergeant Hain, Cook's face was pale, he was trembling, and he would look only at Johnson. Paddy was very rigid, he was pressed against the backseat, and he stared out the driver's-side rear window. Sergeant Hain considered Cook and Paddy to be nervous.

¶ 6       Sergeant Hain asked Johnson for a driver's license and proof of insurance. Johnson provided her Minnesota driver's license but did not provide an insurance card.

¶ 7       Because he was the only officer present, there were three occupants, and two of them appeared nervous, Sergeant Hain asked Johnson to exit the vehicle. As they stood between the Impala and the squad car, Sergeant Hain explained to Johnson that he stopped her because she was following too closely and to discuss the tinted windows. Johnson acknowledged that the windows were too dark and stated that she planned to have them fixed.

---

[1]Each defendant was charged in a separate case and filed his or her own motion to suppress. The trial court conducted a consolidated hearing. Defendants' appeals have been consolidated, and they have filed a consolidated brief.

¶ 8        Sergeant Hain then asked Johnson to sit in the front passenger seat of the squad car. He described their conversation as very polite and friendly.

¶ 9        After entering his squad car, Sergeant Hain began preparing a written warning for following too closely. He also conducted a computer-records check, from which he learned that the Impala was registered in Minnesota.

¶ 10       As they sat in the squad car, Johnson discussed her travel itinerary. She explained that she had traveled from Redby, Minnesota, to Chicago, a 10-hour trip, to drop off a friend whose relative had died. Johnson told Sergeant Hain that she had traveled to Chicago with Cook, who was her boyfriend, and that Cook had brought along a friend to help with the driving. According to Sergeant Hain, Johnson said that they dropped off her friend and turned right around to head back to Minnesota.

¶ 11       As Sergeant Hain was talking with Johnson, he requested that Detective Ryan Monaghan, a K-9 handler, back him up. According to Sergeant Hain, Detective Monaghan was the only officer in the unit available as backup.

¶ 12       Although Sergeant Hain had completed the written warning, he left it on the clipboard. He then told Johnson to wait in the squad car while he spoke to Cook about an insurance card. He exited the squad car and walked back to the front passenger window.

¶ 13       Sergeant Hain asked Cook to look for an insurance card. He also asked Cook for identification and Paddy for his name and date of birth. Sergeant Hain described Cook as being pale, having trembling hands, and having difficulty speaking due to a dry mouth. Based on his 17 years' experience in law enforcement, Sergeant Hain considered Cook to be overly nervous. According to Sergeant Hain, as he stood at the passenger window the second time, he saw green flakes on Cook's face, chest, and pants. Based on Sergeant Hain's police training and experience, he decided that the flakes appeared to be cannabis.

¶ 14       Cook told Sergeant Hain that he and Johnson had driven to Chicago to pick up Paddy. Sergeant Hain considered Cook's story contradictory to Johnson's statement. Sergeant Hain had Cook and Paddy exit the Impala. After obtaining consent from each, he searched them but found no contraband. He did not handcuff either man at that point.

¶ 15       After explaining that he was going to conduct a K-9 sniff of the vehicle, Sergeant Hain had Paddy stand in front of the Impala and had Cook stand to its rear. Sergeant Hain then allowed Paddy to walk a short distance away to relieve himself. According to Sergeant Hain, it is routine procedure to have the occupants exit a vehicle before a K-9 sniff.

¶ 16       During the K-9 sniff, the dog, which was trained to passively alert to the odor of drugs by sitting down, never did so. Instead, the dog was very excited and attempted to jump through the window of the Impala. Detective Monaghan had to repeatedly command the dog to smell for drugs, as the dog was distracted by Paddy's return. According to Detective Monaghan, the dog was trained to protect and previously there had been issues with the dog being distracted by people in the vicinity of a searched vehicle.

¶ 17       Detective Monaghan explained that, even though the dog did not passively alert to the odor of drugs, its behavior indicated that it smelled drugs in the Impala. He added that the dog would indicate the presence of a drug odor by showing behavioral changes such as attention, drive, focus, changing its breathing pattern, perking its ears, and jumping at an object to get to the source of the odor. Factors that affect a dog's sense of smell include wind and whether the drugs are hidden in a deep compartment. It is not uncommon for a dog to try to go through a

window to get at the source of an odor. Although Detective Monaghan shook his head at the conclusion of the K-9 sniff, he explained that he did so because he was frustrated by the dog being distracted by Paddy. He told Sergeant Hain that the dog reacted to the odor of drugs in the Impala.

¶ 18 James Stenfeldt, an expert in training drug-detection dogs, testified for defendants. Stenfeldt admitted that Detective Monaghan and his dog were properly trained. He also admitted that wind could affect a dog's ability to smell drugs. After viewing a video recording of the dog sniff in this case, Stenfeldt opined that the dog did not display a positive alert or otherwise indicate that it smelled drugs. He admitted that there appeared to have been a fairly strong wind. He conceded that a dog will get more excited—such as by breathing faster, perking its ears, and jumping—when it smells drugs.

¶ 19 After Detective Monaghan advised Sergeant Hain that the dog smelled drugs, Sergeant Hain searched the Impala. He found cannabis flakes near the handle of the front passenger door as well as a bullet in the map pocket of the door. He found a loaded handgun between the front passenger seat and the center console. He then handcuffed Cook and Paddy. He then found a second loaded handgun under the driver's seat, $8000 in Johnson's purse, and a large amount of heroin in a backpack in the trunk.

¶ 20 In ruling on the motions to suppress, the trial court noted that it had to decide three possible issues: (1) whether the original stop was valid; (2) if so, whether there was an unjustified prolonged detention; and (3) if the detention was lawful, whether the dog indicated that there was an odor of narcotics coming from the vehicle such that there was probable cause for the search.

¶ 21 As for the original stop, the trial court found that it was a very close call. Nonetheless, it ruled that there was a valid basis to stop the Impala for following too closely.

¶ 22 Turning to whether the detention was unnecessarily prolonged, the trial court first noted that, before writing the warning, Sergeant Hain had ascertained from the records check that the vehicle was registered in Minnesota. The court further found that, even though Sergeant Hain did not give the written warning to Johnson before he exited the squad car, the warning had been completed at that point.

¶ 23 The trial court then addressed whether Sergeant Hain was allowed to go back to the car to ask Cook for proof of insurance, such that the stop was not improperly prolonged. In answering that question, the court ruled that Illinois did not require a vehicle registered in another state to comply with Illinois's liability-insurance requirements. Because Sergeant Hain knew that the vehicle was not registered in Illinois, and thus should have known that the liability-insurance requirements did not apply, he was acting without proper authority when he returned to the vehicle to speak with Cook. Thus, the court concluded that the stop was illegally prolonged, and it granted the motions to suppress.

¶ 24 The State filed a certificate of impairment (see Ill. S. Ct. R. 604(a)(1) (eff. Mar. 8, 2016)) and a timely notice of appeal.

¶ 25                                    II. ANALYSIS

¶ 26        On appeal, the State contends that (1) the traffic stop was not unduly prolonged by Sergeant Hain's return to the vehicle to ask Cook for an insurance card because any mistake regarding the requirement for proof of insurance was objectively reasonable; (2) Sergeant Hain was entitled generally to ask, as part of a traffic stop, for proof of insurance; and (3) Sergeant Hain had probable cause, independent of the dog sniff, to search the vehicle.

¶ 27        When reviewing a trial court's ruling on a motion to suppress evidence, an appellate court uses a two-part standard. *People v. Colyar*, 2013 IL 111835, ¶ 24. We afford great deference to the trial court's factual findings, reversing them only if they are against the manifest weight of the evidence. *Colyar*, 2013 IL 111835, ¶ 24. We review *de novo*, however, the trial court's ultimate legal ruling on whether suppression is warranted. *Colyar*, 2013 IL 111835, ¶ 24.

¶ 28        The United States Supreme Court has held that a dog sniff conducted during a lawful traffic stop does not violate the fourth amendment. *Rodriguez v. United States*, 575 U.S. ___, ___, 135 S. Ct. 1609, 1612 (2015) (citing *Illinois v. Caballes*, 543 U.S. 405 (2005)). However, a traffic stop that exceeds the time needed to handle the matter for which the stop was made violates the fourth amendment's prohibition against unreasonable seizures. *Rodriguez*, 575 U.S. at ___, 135 S. Ct. at 1612. Put another way, a seizure justified by a police-observed traffic violation becomes unlawful if it is prolonged beyond the time reasonably required to complete the mission of issuing a ticket for the violation. *Rodriguez*, 575 U.S. at ___, 135 S. Ct. at 1612 (citing *Caballes*, 543 U.S. at 407).

¶ 29        In *Rodriguez*, the Supreme Court addressed the issue of whether a dog sniff during a traffic stop, absent reasonable suspicion, unreasonably prolonged the time to complete the purpose of the stop. *Rodriguez*, 575 U.S. at ___, 135 S. Ct. at 1614. In answering that question, the Court noted that the tolerable duration of a police inquiry in the traffic-stop context depends on the dual needs of addressing the traffic violation that justified the stop and attending to related safety concerns. *Rodriguez*, 575 U.S. at ___, 135 S. Ct. at 1614. Because addressing the traffic violation is the overall purpose of the stop, authority for the stop ends when tasks tied to the traffic violation are, or reasonably should be, complete. *Rodriguez*, 575 U.S. at ___, 135 S. Ct. at 1614.

¶ 30        Beyond determining whether to issue a traffic ticket, an officer's mission includes ordinary inquiries incident to a traffic stop. *Rodriguez*, 575 U.S. at ___, 135 S. Ct. at 1615. Typically, such inquiries involve checking the driver's license, determining whether there are any outstanding warrants, and inspecting the vehicle's registration and proof of insurance. *Rodriguez*, 575 U.S. at ___, 135 S. Ct. at 1615. Such checks serve the same objective of the traffic code: the safe and responsible operation of a vehicle. *Rodriguez*, 575 U.S. at ___, 135 S. Ct. at 1615.

¶ 31        A dog sniff, however, is a measure aimed at detecting evidence of crime. *Rodriguez*, 575 U.S. at ___, 135 S. Ct. at 1615. Accordingly, it is not an ordinary incident of a traffic stop. *Rodriguez*, 575 U.S. at ___, 135 S. Ct. at 1615. Thus, a dog sniff is not fairly characterized as part of the officer's traffic mission. *Rodriguez*, 575 U.S. at ___, 135 S. Ct. at 1615.

¶ 32        In rejecting the government's contention that an officer may incrementally prolong a traffic stop to conduct a dog sniff so long as the overall duration of the stop remains comparatively reasonable, the Court reiterated that a traffic stop that is prolonged beyond the time reasonably required to complete the mission of the stop is unlawful. *Rodriguez*, 575 U.S. at ___, 135 S. Ct. at 1616. Thus, the critical question is not whether the dog sniff occurs before

or after the officer issues the ticket, but whether conducting the dog sniff prolonged the stop. *Rodriguez*, 575 U.S. at ___, 135 S. Ct. at 1616.

¶ 33    In this appeal, the dispositive issue is whether the mission of the traffic stop had been completed such that the dog sniff unduly prolonged the stop, in violation of the fourth amendment. It did.

¶ 34    The mission of the traffic stop was completed when Sergeant Hain finished the written warning. As the State concedes, because Illinois law did not require Johnson to provide proof of insurance, as her vehicle was properly registered in Minnesota (see 625 ILCS 5/3-402(B)(2)(a), 3-707 (West 2014)), Sergeant Hain mistakenly believed that he was authorized to return to the vehicle to ask Cook for proof of insurance. That unjustified return to the vehicle unduly prolonged the traffic stop.

¶ 35    The State maintains, however, relying on *Heien v. North Carolina*, 574 U.S. ___, 135 S. Ct. 530 (2014), that, because the mistake of law was objectively reasonable, it did not unreasonably prolong the traffic stop. We disagree.

¶ 36    In *Heien*, the Supreme Court addressed the issue of whether a seizure of a vehicle via a traffic stop is rendered unreasonable when the officer stops the vehicle based on a mistaken understanding of the law. *Heien*, 574 U.S. at ___, 135 S. Ct. at 534. In resolving that issue, the Court, acknowledging that the ultimate touchstone of the fourth amendment is reasonableness, recognized that reasonableness does not require perfection. *Heien*, 574 U.S. at ___, 135 S. Ct. at 536. As such, the fourth amendment allows for some mistakes by law enforcement. *Heien*, 574 U.S. at ___, 135 S. Ct. at 536. Those include mistakes of law. *Heien*, 574 U.S. at ___, 135 S. Ct. at 536-40.

¶ 37    In so holding, the Court emphasized that only objectively reasonable mistakes of law will be tolerated. *Heien*, 574 U.S. at ___, 135 S. Ct. at 539. Thus, an officer can gain no fourth-amendment advantage through a sloppy study of the law that he is duty-bound to enforce. *Heien*, 574 U.S. at ___, 135 S. Ct. at 539-40.

¶ 38    In holding that the officer in *Heien* made a reasonable mistake in believing that a vehicle was required to have two working brake lights, the Court noted that the applicable statute was reasonably subject to more than one interpretation and, moreover, had never been construed by any North Carolina Appellate Court. *Heien*, 574 U.S. at ___, 135 S. Ct. at 540.

¶ 39    Applying *Heien* here, we conclude that Sergeant Hain's mistaken belief that Illinois's liability-insurance requirements applied to a vehicle registered in Minnesota was not objectively reasonable. That is so for the following reasons.

¶ 40    First, section 3-707(a) of the Illinois Vehicle Code (Vehicle Code) provides, in pertinent part, that no person shall operate a motor vehicle unless it is covered by a liability insurance policy. 625 ILCS 5/3-707(a) (West 2014). However, section 3-707 adds that only an operator of a motor vehicle subject to registration under the Vehicle Code is subject to a penalty under section 3-707. Further, section 3-402(B)(2)(a) of the Vehicle Code provides, in relevant part, that vehicles subject to registration under the Vehicle Code do not include any vehicle operated interstate and properly registered in another state. 625 ILCS 5/3-402(B)(2)(a) (West 2014). When read together, those provisions unambiguously provide that a vehicle properly registered in Minnesota need not comply with the liability-insurance requirements of the Vehicle Code. Thus, Sergeant Hain, who had ascertained that the vehicle was properly registered in

Minnesota, was not reasonable in his mistaken belief that Johnson needed to provide proof of insurance.

¶ 41 Moreover, an appellate court had previously held that section 3-707 did not apply to a vehicle properly registered in another state. See *People v. Benton*, 322 Ill. App. 3d 958, 960-61 (2001). In doing so, the court held that sections 3-402(B)(2)(a) and 3-707, when read together, unambiguously excepted from the liability-insurance requirements those vehicles properly registered outside of Illinois. *Benton*, 322 Ill. App. 3d at 960-61. Because there was a prior appellate court decision that definitively held that a vehicle registered in another state did not have to comply with the liability-insurance requirements of the Vehicle Code, Sergeant Hain's contrary belief was not reasonable within the meaning of *Heien*.

¶ 42 Because the law unambiguously did not require Johnson to provide proof of insurance, Sergeant Hain's return to the vehicle to ask Cook for an insurance card did not promote any proper purpose for the stop. Thus, it did not justify the continued detention of the vehicle.

¶ 43 Nor was the delay justified by the general authority during a traffic stop to request proof of insurance. Although an officer is generally entitled, as an ordinary incident of a traffic stop, to request proof of insurance (see *Rodriguez*, 575 U.S. at ___, 135 S. Ct. at 1615), it is not reasonable to do so where, as here, the officer knows or should know that proof of insurance is not required.

¶ 44 Because Sergeant Hain unduly prolonged the traffic stop when he returned to the vehicle to ask Cook for proof of insurance, the evidence gathered thereafter—including Cook's version of the travel itinerary, the cannabis flakes seen on Cook, the additional indicia of Cook's and Paddy's nervousness, and the positive dog alert—was obtained in violation of the fourth amendment.

¶ 45 Finally, there was no probable cause, independent of the dog sniff, to search the vehicle. As discussed, the evidence gathered when Sergeant Hain returned to the vehicle was inadmissible, as it was gathered as part of an unlawful detention. Thus, the only facts relevant to the issue of whether there was probable cause to search the vehicle were those about the travel route and Cook's and Paddy's apparent nervousness during Sergeant Hain's initial presence at the vehicle. The trial court found, however, that Sergeant Hain's testimony that Minnesota is a destination for, and Chicago a source of, illegal drugs was alone insufficient to establish that assertion. We agree. There needed to be some additional evidence to establish that Minnesota and Chicago are endpoints of drug trafficking. Moreover, even if they are, merely driving to and from those locations would not alone support probable cause to search for evidence of drug trafficking. Nor was the abbreviated stay in Chicago particularly suspicious in light of Johnson's explanation that they had driven to Chicago to drop off a friend whose family member had died. As for Cook's and Paddy's apparent nervousness, that alone was insufficient to provide probable cause to search the vehicle. In sum, the evidence was insufficient to provide probable cause to believe that the trio was involved in drug trafficking. Thus, there was no probable cause independent of the dog sniff to justify the search of the vehicle.

¶ 46                                            III. CONCLUSION

¶ 47 For the reasons stated, we affirm the judgments of the circuit court of Kane County.

¶ 48 Affirmed.