2021 IL App (2d) 190354-U
No. 2-19-0354
Order filed September 2, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 17-CF-1255 |
| ARTAVEUS LOWE, | ) ) | Honorable T. Clint Hull, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE JORGENSEN delivered the judgment of the court.
Presiding Justice Bridges and Justice Brennan concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court properly denied defendant's motion to suppress cannabis found on his person during a traffic stop.  The officer deviated from the stop's purpose by investigating whether defendant possessed drugs, but that deviation did not unlawfully prolong the stop.

¶ 2    Defendant, Artaveus Lowe, was charged with unlawful possession of a synthetic cathinone (720 ILCS 570/402(c) (West 2016)).  He moved to suppress evidence that the police seized following a traffic stop.  The trial court denied the motion.  After a stipulated bench trial, the court found defendant guilty and sentenced him to two years' probation.  On appeal, he contends that the trial court erred in denying his motion to suppress.  We affirm.

¶ 3                                    I. BACKGROUND

¶ 4      Defendant's motion alleged that, after he was stopped for minor traffic infractions, a K-9 unit was called based on a hunch that he might have drugs. Defendant admitted to the K-9 officer that he had drugs. Citing *United States v. Rodriguez*, 575 U.S. 348 (2015), he argued that, even though the traffic stop was proper, the drug inquiry prolonged it beyond the time reasonably required to fulfill its original purpose.

¶ 5      We recount the evidence at the hearing on defendant's motion. In the defense case, defendant testified as follows. On July 1, 2017, at about 12:38 a.m., he drove to a Mobil station at Villa and Liberty Streets in Elgin. He had a driver's license and his car was insured. Shortly after he left the station, a police officer pulled him over. Defendant did not provide his license and insurance card at the time, explaining to the officer that he had taken some possessions out of the car because it had been vandalized recently. He told the officer his name and date of birth and said that he had a license and registration and was on federal probation. The officer returned to his squad car.

¶ 6      Defendant testified that, after he had waited in his car for about 10 minutes, a K-9 officer approached. The officer repeatedly asked defendant whether he had drugs in the car. Finally, defendant said that he had marijuana in his pocket and had been "smoking green" inside the car earlier. Defendant was searched and taken into custody, and his car was then searched. The police never used a dog in the stop or the search. Defendant was issued three traffic tickets.

¶ 7      Defendant called Sean Callahan, an Elgin police officer. On direct examination, he testified as follows. On July 1, 2017, just after midnight, he was on patrol by himself and stopped a car for failing to signal as it entered a roadway and not having rear license-plate lights. Callahan

spoke to the sole occupant, defendant, then returned to his squad car and ascertained that defendant had a valid license. During the stop, Officers Schuttrow, Rizzuto, and Alcorn arrived on the scene.

¶ 8 A portion of the recording made by Callahan's body camera and microphone was played. The segment lasted the initial 11 minutes and 52 seconds of the encounter. At 12:40:45, Callahan approached defendant and requested his license and proof of insurance, then asked for his name and date of birth. He asked defendant whether he was on probation or parole; defendant responded that he was on federal probation for counterfeiting. At 12:42:06, Callahan asked defendant whether he had anything illegal in the car; defendant said no. Callahan returned to his squad car, called dispatch, and learned that defendant had a valid license. At approximately 12:46:00, he received a personal call but immediately cut it short. Callahan worked on his computer. At 12:46:40, he asked another officer whether he had ever dealt with defendant. Callahan worked further on his computer. Between approximately 12:47:58 and 12:48:10, he stated that defendant was on federal probation for "funny money" and was a Gangster Disciple. At approximately 12:48:36, the K-9-unit dog started barking. At 12:48:58, Callahan told the K-9 officer, Schuttrow, "I don't know if you saw my notes" and added that defendant was a gang member on federal probation, which might affect his fourth amendment rights. At 12:49:25, Callahan called defendant a "career criminal" and repeated his name.

¶ 9 At 12:49:25, the first traffic ticket was printed. At 12:49:58, the second traffic ticket was printed. Between 12:50:12 and 12:50:39, Callahan stated that defendant had a "very long history" and was on federal probation, and he reiterated that he did not know how that affected the officers' right to search him. Callahan kept typing; information on defendant appeared briefly on the computer screen. At 12:51:17, Callahan spoke very briefly to a responding officer. At 12:51:29,

he exited his squad car and walked to defendant's car. An officer was patting down defendant and another officer was standing on the other side of the car.

¶ 10    Callahan testified that he entered the notes he had mentioned to Schuttrow into the department's Computer Automated Dispatch (CAD) system, to which other officers had access. Asked to explain the notes' purpose, Callahan testified, "Part of what our administration likes to see when a K-9 is called for is the reason why a K-9 was called." The notes were for the benefit of Schuttrow "[a]nd general documentation to any officers that may be responding to the scene."

¶ 11    Callahan testified that, at some point, the police recovered a bag of suspected cannabis and handcuffed defendant.

¶ 12    Callahan testified on cross-examination as follows. After speaking to defendant, he left at 12:42:52 and returned to his squad car at 12:43:46, when he called dispatch. He routinely called dispatch "[f]or a multitude of reasons," such as confirming a person's driving status and checking for warrants. After hearing that defendant had a temporary registration, Callahan ran a check before generating the citations. This took longer than with a normal registration, in which "for generating ticket purposes," the information will "auto-populate." By contrast, with a temporary registration, the officer must compare all of the information with "what is on the LEADS [(Law Enforcement Automated Data System)] return" in completing the citation.

¶ 13    Callahan testified that, during the entire 11 minutes and 52 seconds played in court, he was "actively working on citations," except for the four seconds that he was interrupted by the incoming call. He was trying to issue three citations in all. The examination continued:

> "Q. You were not chitchatting with other police officers and delaying time speaking with them, is that correct?

A. No. I was advising them of general information of who the defendant was from an officer safety standpoint.

Q. And why did—why were there two other officers called to that scene or to assist you?

A. Per policy, if we intend to use a K-9 for an open air sniff, they always want at least one additional officer to stand with the occupant or occupants of the vehicle while they are outside of the vehicle while the K-9 handler is conducting their end of the K-9.

Q. And according to the CAD history report, Officer Rizzuto arrived on the scene at 12:45:18, correct?

A. Yes.

Q. And Officer Alcorn arrived on the scene at 12:45:58, correct?

A. Yes.

* * *

Q. And let me make sure I have this correct; and that is exactly three minutes after you first called dispatch, correct, that they arrived?

A. Yes, approximately."

¶ 14 Callahan testified that, at 12:47:38 on the video, the dog in Schuttrow's squad car started barking. Callahan printed the first ticket at approximately 12:49 and the second ticket at approximately 12:50. Before he printed the third ticket (which occurred after the segment played in court), Callahan learned from Rizzuto that Schuttrow was speaking to defendant.

¶ 15 Callahan testified that he requested a K-9 officer while walking back from defendant's car, because he "wanted to not delay the traffic stop any longer." The basis for the request was that defendant had just left a gas station where Callahan had "commonly known people to go *** to

buy drug paraphernalia, and then coupled with the fact that defendant advised [Callahan] he was on federal probation as well."

¶ 16    Defendant rested.  The State moved for a directed finding, arguing as follows.  Callahan spent about two minutes talking to defendant and called for a K-9 officer less than a minute later. The K-9 officer arrived about six minutes after Callahan had "called out to dispatch."  By the time Schuttrow had obtained probable cause to arrest defendant for drug possession, Callahan was still printing out traffic tickets.  Thus, the drug inquiry did not prolong the stop.

¶ 17    Defendant responded as follows.  The initial stop was valid, but it was prolonged by a matter that was outside its mission.  Under *Rodriguez*, the length of the delay was irrelevant; the authority for the stop ended when the tasks tied to the traffic infractions were or reasonably should have been completed.  Thus, that the tickets had not been printed when Schuttrow arrived was not dispositive, as arranging for the K-9 unit could have delayed printing the tickets.  Moreover, although *Rodriguez* held that officer safety is related to the original mission of the stop, that does not apply to safety concerns generated by actions outside the original mission.

¶ 18    Defendant contended that the foregoing law bore directly on Callahan's time preparing the CAD notes while defendant waited. Callahan testified that he typed the notes because they were required when the police requested a K-9 officer and were intended for the benefit of the K-9 officer.  Therefore, for part of the time that Callahan sat in his squad car, he was "not working, actively working on the citation as he said because at some point he ha[d] to be typing these notes." Thus, Callahan delayed processing the traffic offenses in favor of the drug inquiry.  This impermissibly prolonged the stop.

¶ 19    The trial court denied the State's motion for a directed finding.  The court held that, viewing the evidence in the light most favorable to defendant, he had shifted the burden to the State.

Callahan had not indicated whether the notes he typed "were in addition to or as [*sic*] part of the traffic stop." Thus, the court was "not sure whether that prolonged or did not prolong or just was part of what he was doing."

¶ 20    The State called Callahan. He testified on direct examination as follows. One line of his call log was a CAD entry reading, "K-9 called, driver documented gang member and on federal probation, performed by mobile unit 302C." He explained why he made this CAD entry:

"A. *** [T]he reason for that being done is for documentation purposes, *they want to know why a K-9 is being called.* They want that documented, and also our CAD, when I add a narrative, anybody that is assigned to the dispatch is updated in real-time, as far as there might be a half a second delay between me sending it [*sic*]. And then it literally, the computer, when you are driving to a call, and whether dispatch adds notes or an officer on scene adds notes, it will tell you, 'dispatch updated.'

And *so that is for information for officers that may be responding* just so they are generally aware of what might be going on inside the vehicle or who is stopped.

Q. And information that the defendant is a gang member and on federal probation, does that go to officer safety?

A. Yes." (Emphases added.)

¶ 21    Callahan testified that it took him "10 to 15 seconds at the most" to type these words. It was all on the same screen that he used to "toggl[e] back and forth between to see the LEADS return, vehicle return, photos of the defendant." The prosecutor asked, "And this was at the same time that you were gathering information with respect to his temporary registration, correct?" Callahan responded, "Correct." Callahan testified that he was receiving information about defendant's registration and typing it in during this time. This information came either from

dispatch through the earpiece or from one of the screens on his computer. He did not have to type in anything when an officer arrived on the scene; dispatch took care of that.

¶ 22    The examination turned to other information that appeared in the log but had not been typed in by Callahan. The examination continued:

"Q. This documentation was not solely for the purpose of prolonging the stop for the K-9 officer to get there, is that correct?

A. Absolutely not.

Q. This information is going out to the other officers regardless of whether or not a K-9 officer is coming or not [*sic*]?

A. That's correct.

Q. And in this case, Officer Schuttrow did not take time to have the dog even exit the vehicle and search, did he?

A. That's correct."

¶ 23    Callahan testified on cross-examination as follows. He entered the CAD notes for two reasons: (1) to document why a K-9 officer was called and (2) the safety of the responding officer. He agreed that he called the other officers because it was department policy that "when you have a K-9 present, you want other officers to be able to stand with the car's occupants so *** the K-9 can search safely." The cross-examination concluded:

"Q. *So the extra officers that responded were responding because you made a call for a K-9, is that right?*

A. *I believe so.* It's general standard practice that we will back each other up, commonly.

Q. Okay. So it's a common practice for K-9, safety K-9 purposes that other officers would be present?

A. Even on just traffic stops that don't involve a K-9, it's very standard on the midnight shift to have backup officers." (Emphases added.)

¶ 24 The State rested.

¶ 25 In argument, the State contended that the evidence proved that Callahan did not prolong the stop by typing in his CAD notes, because he did it while he was waiting to receive part of the information on defendant's temporary registration, which he needed to complete the traffic tickets. The State contended next that Callahan had the right to call the K-9 officer because (1) defendant had come from a location where Callahan had reason to believe that drug activity was going on and (2) Callahan learned that defendant was on probation. The State argued that the stop was brief and that typing one sentence did not prolong it.

¶ 26 Defendant argued that his presence and his probation status had no bearing on the propriety of the police action here. Further, under *Rodriguez*, how long it took Callahan to type the CAD notes was not dispositive; the key fact was that it prolonged the stop. Callahan testified that he typed the notes to prepare both the K-9 officer and the responding officers only because the K-9 officer would be there. Thus, Callahan created the CAD notes in preparation for the drug-related inquiry, not in connection with the original mission of the stop.

¶ 27 The court found as follows. Callahan acted diligently throughout the stop and engaged in no dilatory tactics. The court stated that, "based upon the diligent work by [Callahan], I don't find the purpose of the stop was changed. It was to issue the traffic citations." Further, "[t]he citations were issued and were not even printed out by the time [defendant] admitted that he was possessing cannabis and was arrested." The court denied the motion to suppress.

¶ 28   The cause proceeded to a stipulated bench trial. The court found defendant guilty and sentenced him to two years' probation. He timely appealed.

¶ 29                                   II. ANALYSIS

¶ 30   On appeal, defendant contends that the trial court erred in denying his motion to suppress, because, although the traffic stop was valid, the officers prolonged his detention without independent grounds for a seizure. Defendant focuses on Callahan's preparation of the CAD notes. He contends that Callahan did so not to facilitate processing the traffic violations but to assist the K-9 team for a separate purpose. Defendant argues that, had Callahan not so detoured from the original purpose of the stop, it would have ended sooner. He notes that *Rodriguez* does not allow even a *de minimis* prolongation for a purpose unrelated to the original mission of the stop, unless that purpose has a sufficient basis in the fourth amendment.

¶ 31   In reviewing a ruling on a motion to suppress, we accept the court's findings of fact unless they are against the manifest weight of the evidence, but we consider *de novo* the ultimate legal issue of whether suppression was proper. *People v. Harris*, 228 Ill. 2d 222, 230 (2008).

¶ 32   A lawfully initiated traffic stop may violate the fourth amendment if prolonged beyond the time reasonably required to complete its mission and attend to related safety concerns. *Rodriguez*, 575 U.S. at 354; *People v. Bass*, 2021 IL 125434, ¶ 16. Even a *de minimis* increase in the length of a stop is impermissible absent reasonable suspicion. *Rodriguez*, 573 U.S. at 354-60; *People v. McKelvy*, 2019 IL App (2d) 180630, ¶ 17. " '[D]etecting evidence of ordinary criminal wrongdoing,' " such as by conducting a dog sniff to detect the presence of illegal drugs, is not within the mission of a traffic stop. *Rodriguez*, 575 U.S. at 355-56 (quoting *Indianapolis v. Edmond*, 531 U.S. 32, 40-41 (2000)); *People v. Paddy*, 2017 IL App (2d) 160395 (2017), ¶ 31. Because on-scene investigation of crimes other than those connected to the mission of the stop

detours from that mission, so do safety precautions taken in order to facilitate such detours. *Rodriguez*. 573 U.S. at 356. However, the pursuit of unrelated inquiries does not invalidate the stop unless it measurably extends its duration. *Id.* at 357.

¶ 33 Before turning to the case law that most directly applies here, we clarify two matters. First, we agree with defendant that, although a dog sniff itself does not trigger the fourth amendment (*Illinois v. Caballes*, 543 U.S. 405, 410 (2005)), it must nonetheless be conducted in a manner that does not prolong the traffic stop (*Rodriguez*, 575 U.S. at 354-55; *People v. Heritsch*, 2017 IL App (2d) 151157, ¶ 10.) Although Schuttrow never conducted a dog sniff here, that was only because his questioning of defendant obviated the need to do so. The dog did nothing in the night (except bark), but Schuttrow's questioning was as much a drug inquiry as a sniff would have been.

¶ 34 Second, we agree with defendant that the initial drug-related inquiry lacked an independent fourth-amendment justification. Callahan testified that he based it on defendant's probation status and his presence at a gas station where he had "commonly known people to go *** to buy drug paraphernalia." However, that a person is on probation is not a reasonable ground to suspect that he has committed a fresh crime. Also, gas stations and other retail establishments that are "commonly known" as sites for drug deals are frequented by many people doing nothing illegal. Thus, the facts on which Callahan relied were insufficient for investigatory detention, as they "describe a very large category of presumably innocent travelers, who would be subject to virtually random seizures." (Internal quotation marks and citation omitted.) *People v. Ortiz*, 317 Ill. App. 3d 212, 225 (2000). With these considerations clarified, we turn to the main issues in the case.

¶ 35 Defendant relies primarily on Callahan's actions in arranging for the presence of the other officers and only secondarily, if at all, on the actions of Schuttrow and the other responding officers. Defendant contends that the following actions by Callahan detoured from the mission of

the traffic stop: (1) his request for a K-9 unit; (2) his preparation of the CAD notes; (3) his discussions with another officer, apparently Schuttrow each time, about defendant's background and other information in the CAD notes; and (4) his final discussion about defendant, which he undertook after the second ticket was printed but before the third ticket was. Defendant argues that because the third ticket had almost been printed when the other officers obtained probable cause to arrest defendant for a drug offense, the stop lasted longer than it would have had Callahan not deviated from processing the traffic offenses. Thus, the third ticket would have been ready and defendant would have been finished with the officers before the 12:52 mark on the tape.

¶ 36    The State responds that (1) the request for a K-9 unit did not add time because Callahan made it while he was returning to his squad car; (2) the CAD notes were related to the mission of the stop and concerned officer safety matters that existed regardless of whether the K-9 unit was involved; (3) Callahan did not stop working on the citations while he was discussing defendant with Schuttrow.

¶ 37    The trial court's statements of its factual findings and legal conclusions were not detailed. Piecing together its comments in denying the State's motion for a directed finding and in later denying defendant's motion to suppress, we note as follows. First, the court concluded that the defendant's evidence, viewed in the light most favorable to him, established that Callahan had engaged in one or more "detours" that made defendant's detention longer than necessary to complete the stop's original mission." Therefore, the court denied the State a directed finding. Although the court specifically mentioned only the CAD notes, there was evidence of other detours, primarily what Callahan told Schuttrow about defendant and his record.

¶ 38    Second, in denying defendant's motion to suppress, the court first concluded that Callahan had been diligent and did not engage in dilatory tactics. The court stated that, "based upon the

diligent work by [Callahan], I don't find that the purpose of the stop was changed. It was to issue the traffic citations." This conclusion is not against the manifest weight of the evidence, but it is by no means dispositive. *Rodriguez* rejected the theory that "by completing all traffic-related tasks expeditiously, an officer can earn bonus time to pursue an unrelated criminal investigation." *Rodriguez*, 575 U.S. at 357. Moreover, as we shall explain, the court implied that Callahan had engaged in no "detours." because "the purpose of the stop was [not] changed." That conclusion was against the manifest weight of the evidence.

¶ 39    Thus, the issue remains whether the court correctly held that no detours prolonged the stop. Whether the tickets were issued before or after the arrest was not dispositive. See *id.*; *Bass*, 2021 IL 125434, ¶ 20.

¶ 40    Our dual inquiry is: was it against the manifest weight of the evidence to hold that either (1) there were no detours and (2) there were detours but they did not prolong the stop? Only if defendant prevails on both matters may we reverse the trial court.

¶ 41    On the first matter: Callahan engaged in several detours from the mission of the traffic stop, all connected with investigating possible drug offenses for which he had only a hunch. These were (1) calling the K-9 unit; (2) typing the CAD notes; and (3) discussing with Schuttrow the CAD notes and defendant's background. As noted, the investigation of possible drug activity is not within the mission of a traffic stop. Neither are officer safety precautions taken to facilitate the drug investigation. *Rodriguez*, 575 U.S. at 356-57; *Paddy*, 2017 IL App (2d) 160395, ¶ 31.

¶ 42    All three actions were outside the stop's mission. First, the call for a K-9 unit was obviously done to investigate a possible drug offense. Second, despite what the trial court appears to have suggested, preparing the CAD notes was also outside the scope of the traffic stop. Callahan repeatedly testified that he typed up the CAD notes as preparation for the K-9 investigation,

implying that he would not have done so absent that inquiry. During Callahan's testimony as a defense witness, he was asked about the purpose of the notes. He responded that it is department policy "when a K-9 is called," to give the "administration" "the reason a K-9 is to be called." He added that the CAD notes here were for the benefit of both Schuttrow, the K-9 officer, and "any officers that may be responding to the scene." Although the latter reference, taken by itself, might imply that the unspecified officers who "may be responding to the scene" would have done so even without the K-9 investigation, Callahan later clarified that the Rizzuto and Alcorn were there because of the K-9 investigation. He said: "Per policy, if we intend to use a K-9 for an open air sniff, they always want at least one additional officer" to stand with the driver while the K-9 officer is busy working with the dog. In his testimony on direct examination as a State witness, Callahan was asked about his CAD note on defendant's probation status and gang affiliation. He explained that the note was "for documentation purposes, [because] they want to know why a K-9 is being called." On cross-examination, he reiterated that he entered the CAD notes to document the reason for calling the K-9 officer and for the safety of the responding officers, and he agreed that "the other officers that responded were responding *because* [*Callahan*] *made a call for a K-9*." (Emphasis added.)

¶ 43    Callahan did add that, "[e]ven on just traffic stops that don't involve a K-9, it's very standard on the midnight shift to have backup officers." However, that was a general statement about police practices, not a specific statement that here the other officers were called to ensure Callahan's safety in completing the traffic stop. Callahan testified clearly that the other officers were there because of the drug investigation, notwithstanding what officers might usually do on midnight shifts. Thus, the CAD notes resulted solely from the detour into the drug investigation and were tied to both department policy and officer safety *as they regarded that new investigation*.

¶ 44    Finally, Callahan's discussions with Schuttrow were tied to the drug investigation and the anticipated dog sniff. This is self-evident: Schuttrow was a K-9 officer, acting as such, and would not have been there had Callahan kept to the original mission of the stop. Callahan told Schuttrow what he had written in his CAD notes, which were directed to the drug inquiry.

¶ 45    Thus, we conclude that Callahan engaged in several detours that were unrelated to the original mission of the stop. This brings us to the second inquiry: does the manifest weight of the evidence show that the cumulative effect of the detours prolonged the stop past when it would have finished had Callahan adhered to the original mission? There are two possible reasons that the detours, individually or collectively, might not have prolonged the stop. First, a detour might not have added any time to how long it would have taken Callahan to process the traffic offenses; he might have completed it during time that would have passed anyway. Second, as in *Heritsch*, any additional time that the detour cost might have been counterbalanced if the new inquiry established probable cause for a drug arrest before the traffic stop would have been completed even without the detour. See *Heritsch*, 2017 IL App (2d) 151157, ¶ 18. We turn to the three detours, examining their individual and cumulative effect.

¶ 46    The first detour, the call for the K-9 unit, is not problematic. Callahan made the call while returning to his car after speaking to defendant, which he would have done anyway. So the call took no extra time.

¶ 47    The second detour, typing the CAD notes, is less clear. Callahan did this while he was also in the process of receiving information relevant to the traffic stop. Based on the testimony, the notes consisted of only a few lines. Moreover, it is anything but clear how much of the typing Callahan did in "down time," while he was waiting for updated information on driving-related matters. If he filled in otherwise dead time by typing CAD notes, that would not have prolonged

the stop. Considering that Callahan's notes were brief and that he had at least some time to do it while waiting to be updated on defendant's driving record and dangerousness, we cannot say that defendant proved that typing in the CAD notes prolonged the stop.

¶ 48 We turn third to Callahan's discussions with Schuttrow. Again, these were brief, taking up perhaps a minute cumulatively. Again, from the record, including the videotape, it is difficult to tell whether Callahan could have done anything to expedite the traffic stop in these periods. However, it appears that, during the final interchange with Schuttrow, Callahan was waiting for the third citation to print out, implying that this was more downtime.

¶ 49 Finally, we consider that Schuttrow and the other officers did not take long to obtain probable cause for drug possession. Callahan exited his squad car at 12:51:29, before the third ticket was printed, so it is clear enough that probable cause arose before then. Beyond that, the record is murky. We do not know just when defendant admitted to drug possession. Without more to go on, it would be speculation to consider whether the K-9 team's determination of probable cause occurred before the stop would have been completed had it been strictly limited to the original offenses and the attendant safety concerns. As defendant had the burden of proof, we must resolve the ambiguities against him. See *McKelvy*, 2019 IL App (2d) ¶ 24. Thus, we may not disturb the denial of his motion to suppress, and we affirm the judgment.

¶ 50                                  III. CONCLUSION

¶ 51 For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 52 Affirmed.