2022 IL App (4th) 210475

NOS. 4-21-0475, 4-21-0635 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
October 4, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Woodford County |
| JERMAINE M. WALLACE, | ) | Nos. 19CF63, 19TR814 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Charles M. Feeney III, |
| | ) | Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court, with opinion.
Presiding Justice Knecht and Justice Turner concurred in the judgment and
opinion.

**OPINION**

¶ 1        In May 2019, the State charged defendant, Jermaine M. Wallace, with two counts

of possession of a weapon by a felon (720 ILCS 5/24-1.1(a) (West 2018)), obstructing justice (*id.*

§ 31-4(a)), and driving while license suspended (DWLS) (625 ILCS 5/6-303(a) (West 2018)).

¶ 2        Defendant waived his right to jury trial and filed a motion to suppress evidence. In

February 2021, the trial court conducted a hearing on defendant's motion to suppress and his bench

trial simultaneously. At the conclusion of the State's evidence, the trial court denied defendant's

motion to suppress. After defendant presented evidence at the bench trial, the court found him

guilty of all charges. The court subsequently sentenced defendant to concurrent terms of four years

in prison on each weapon charge, two years in prison on the obstructing charge, and 180 days in

jail on the DWLS charge.

¶ 3        Defendant appeals, arguing (1) the trial court erred by denying his motion to

suppress evidence, (2) the trial court erred by considering defendant's 2003 felony conviction to impeach his credibility, (3) the State failed to prove defendant guilty beyond a reasonable doubt, and (4) defense counsel rendered ineffective assistance by failing to file a motion to sever the charges.

¶ 4    Because we agree with defendant's second argument, we reverse defendant's convictions for possession of a weapon by a felon and remand for a new trial solely on those charges. However, we affirm defendant's convictions for obstructing justice and DWLS.

¶ 5                                    I. BACKGROUND

¶ 6                          A. The Charges Against Defendant

¶ 7    In May 2019, the State charged defendant by information in case No. 19CF63 with two counts of possession of a weapon by a felon (counts I and II) (720 ILCS5/24-1.1(a) (West 2018)) and one count of obstructing justice (count III) (*id.* § 31-4(a)). Counts I and II alleged that, on May 2, 2019, defendant possessed a Glock 9-millimeter handgun (count I) and a Ruger LCP .380 handgun (count II) after having been previously convicted of a felony violation of the Cannabis Control Act (720 ILCS 550/1 *et seq.* (West 2018)) in Logan County, Illinois, case No. 03CF62. Count III alleged that defendant knowingly destroyed evidence by flushing a plastic bag that was concealed on his person down the toilet after a deputy ordered defendant to hand the bag to him.

¶ 8    The charges arose from a traffic stop, during which defendant was charged by citation in case No. 19TR814 with DWLS (625 ILCS 5/6-303 (West 2018)).

¶ 9            B. The Motion To Suppress Evidence and the Bench Trial

¶ 10    In December 2020, defendant filed a motion to suppress evidence, alleging the traffic stop that gave rise to the charges against him was not supported by (1) probable cause to

believe a traffic violation had occurred or (2) a reasonable, articulable suspicion of criminal activity. Defendant requested that the trial court suppress "any and all evidence seized as a result of said improper stop, arrest of defendant, and search of [his] vehicle."

¶ 11    In February 2021, the trial court simultaneously conducted (1) a hearing on defendant's motion to suppress and (2) defendant's bench trial. (We note that, although the defendant generally bears the burden of proof on a motion to suppress evidence, because the court was also conducting defendant's bench trial, the State presented its evidence first.)

¶ 12                    1. *The State's Evidence*

¶ 13    Woodford County deputy sheriff Nathan Campbell testified that around 8 p.m. on May 2, 2019, he was "conducting traffic stops on I-39." Campbell stated that he "ended up making a traffic stop on a vehicle for a window tint violation as well as an insurance violation." The prosecutor asked Campbell to describe, specifically, what he observed, and the following exchange occurred:

"CAMPBELL: [I] had my lights illuminating across southbound traffic watching vehicles as they passed through. And I noticed as [defendant's] vehicle came through that they had their window—it wasn't completely down, but it was down—probably had nine, ten inches that was left sticking up. And I could see the window was, obviously, tinted too dark because you couldn't see through it at all. And I ultimately ended up pulling out after the vehicle and ran the vehicle's registration through LEADS, and it showed me that the vehicle did not have valid insurance.

PROSECUTOR: Okay. And is this something—you do that on every traffic stop, you run the vehicle through LEADS?

- 3 -

CAMPBELL: Yes, sir.

PROSECUTOR: And is that a system that assists you in determining whether people have outstanding warrants, whether their vehicle has registration, and whether they have a valid license?

CAMPBELL: Yes, sir.

PROSECUTOR: Okay. When you learned this information did you perform an actual traffic stop?

CAMPBELL: Yes, sir. After running the license plate and receiving that information [that the vehicle did not have valid insurance] and then viewing the windows, I conducted a traffic stop."

¶ 14 Campbell testified that the vehicle had license plates from Georgia. Defendant was the driver and sole occupant of the car. Campbell stated that, upon making contact, defendant was "uncomfortable," "rigid, kind of wide-eyed," and "sheepish about eye contact." Campbell testified that they "spoke about the reason with the insurance card so I could match up those VIN numbers, and everything else." Campbell explained, "[M]aybe he did have insurance and perhaps it wasn't properly documented through Georgia's system and to essentially figure out what the issue was there, why it was showing that he didn't have insurance."

¶ 15 Campbell testified that he returned to his squad car "to [try] to figure out the issue with insurance" and "to run his driver's license information." Campbell ran defendant's driver's license information through his squad car computer and learned that defendant's Georgia driver's license was suspended. (We note that defense counsel objected to "the hearsay *** regarding the status of his license." After confirming the State would present other evidence that defendant's license was suspended, the court admitted the testimony "for the limited purpose to show what

took place and what steps the officer took.")

¶ 16    The prosecutor asked Campbell if he learned anything else about the insurance or registration. Campbell responded that, at that point, "there was a bigger issue at hand with his license, and I don't know that I really messed with anything else at that time on his insurance." Campbell testified that he placed defendant under arrest for driving on a suspended license. A second police officer, Deputy Park, had responded to the scene by this time.

¶ 17    Campbell testified that, after placing defendant in handcuffs, he and Park conducted an inventory search of defendant's vehicle pursuant to department policy because the vehicle was being impounded. Campbell testified that they found two pistols, a Glock and a Ruger, in the locked glove box of the vehicle. He stated that they gained access to the glove box with the vehicle key, which he retrieved from defendant. Campbell testified that the glove box opened easily and the pistols were immediately visible. He said there was not much in the glove box other than the handguns. Two loaded magazines were lying next to their respective pistols. Campbell testified that they also found a cannabis vape and a digital scale in the center console.

¶ 18    At the jail, Campbell asked defendant about the guns. Campbell verified with defendant that he was a felon and remarked to defendant that he should know better than to travel cross-country with pistols in his glove box. Campbell testified that defendant denied knowing about the guns and then invoked his right to remain silent. Campbell turned defendant over to the custody of Deputy Chad Pyles at the Woodford County jail.

¶ 19    On cross-examination, Campbell testified that he received the information regarding the vehicle's lack of insurance from "LEADS, NCIC." He explained that LEADS is a database local to Illinois and NCIC is a database that "goes through nationally." He also explained that Illinois does not report insurance information, "[b]ut apparently, Georgia must require you to

put your insurance information—register it with the DMV. I would assume. But it returned that he had no valid insurance for that vehicle." Campbell also testified that, upon running the vehicle's registration, he discovered the vehicle was registered to Dorothy Porter (later identified as defendant's wife).

¶ 20		Defense counsel asked Campbell, "So you, ostensibly, stopped the vehicle because of the insurance, correct?" Campbell answered, "As well as the window tint violation, yes, sir."

¶ 21		At the conclusion of Campbell's testimony, the trial court admitted into evidence, without objection, a certified copy of conviction showing defendant was convicted in 2003 in Logan County case No. 03CF62 of the offense of possession with intent to deliver cannabis, a class 3 felony.

¶ 22		The State then moved to admit a document from the State of Georgia regarding the status of defendant's driver's license. The prosecutor characterized the document as follows:

> "I ask to admit People's Exhibit 7, which is a business record from the State of Georgia Department of Driver's Services stating that defendant's license is suspended due to an unknown out-of-state, is what it says. This is valid as of February 18th, 2021. States that the disposition started—the suspension started September 9th, 2017."

¶ 23		Defendant objected, arguing that the document did not meet the requirements of a business record and the certification was only a typed signature. Defendant also argued that the document did not show when the suspension began because it listed an "effective [date of] June 28th, 2015, *** disposition [date of] September 9th, 2017, a reinstate eligible [date of] June 28th, 2015, [and] process [date of] September 9th, 2017."

¶ 24		The State responded as follows:

"Your Honor, this is what the State of Georgia has provided for us in regards to the suspension. We have asked for more specifics in the past. This is what is stated. It's my understanding that the—although it doesn't have the specific date of May 2, 2019, listed on this particular document, which we did ask for, it—the suspension has been in until—it is currently even in effect. So I believe it covers a large time period."

¶ 25    The trial court reviewed the document and accompanying certification and found it admissible as a business record and public document. The court commented, "Now, as to what it says, that goes to whether somebody is proven guilty beyond a reasonable doubt[.]"

¶ 26    The State then called Pyles, who testified that he was currently employed as a deputy with the Woodford County Sheriff's Office, but on May 2, 2019, he was employed as a correctional officer at the Woodford County jail. Pyles testified that he took defendant through the booking process after Campbell brought him in. Part of this process included "dressing" defendant to "go into population, to the jail." He explained that "dressing" meant taking the inmate's personal belongings and putting him into jail-issued clothing. Part of the dressing process is conducting a search to make sure that no contraband goes into the jail.

¶ 27    Pyles testified that he and defendant were in a private shower room and defendant was not handcuffed. Pyles ordered defendant to remove his clothing, perform a 360-degree turn, squat, and cough. Defendant, however, made only a partial turn. Pyles ordered him again to perform a full turn and defendant again performed only a partial turn, refusing to expose his back side. Pyles testified that he took a step forward and "saw something protruding from [defendant's] buttocks *** that appeared to be plastic." Pyles stated that he asked defendant to hand him the object, which Pyles described as "a brown paper bag wrapped in [cellophane]" about the size of a

- 7 -

hockey puck. Pyles testified that defendant "[took] a deep breath, grabb[ed] it, and then whatever he had threw it right into the toilet." Pyles testified that he "tried to go for it" but defendant "boxed me out" and "he ended up flushing the item, *** and that was it." Pyles stated he ordered defendant to the ground with his taser and when he looked back at the toilet, "[the item] was gone." Pyles testified that he tried to shut the water off and obtain the item but he was unsuccessful.

¶ 28    The parties then stipulated that a forensic scientist specializing in fingerprints would testify "that no latent fingerprints were found on either firearm." The State rested.

¶ 29        2. *The Trial Court's Ruling on Defendant's Motion To Suppress*

¶ 30    After the State rested, defendant asked the trial court to (1) grant his motion to suppress and (2) enter directed findings of not guilty on counts I, II, and III. The court denied both motions. Regarding the basis for the traffic stop, the court stated the following:

"[C]learly, in this state it is illegal to operate a motor vehicle without insurance. That is, you know, a part of our traffic code and people get tickets for that all the time. *** We don't typically stop people for that because we have no way of knowing in Illinois, generally speaking, especially with Illinois-registered vehicles, that they have or do not have insurance. Interestingly, it appears in Georgia they do have such a law. And [Campbell] gets feedback from his computer that says this car doesn't have insurance. He's getting that not from LEADS but *** NCIC. ***

And that's a reasonable basis. That is not just some crackpot source of information, you know. He didn't read it in People Magazine. He is reading it here on his computer about the fact that this car—now, what does that mean about the defendant? It doesn't necessarily mean anything about the defendant. Maybe

- 8 -

defendant has some sort of insurance that personally covers him everywhere he drives whenever he's driving. I don't know. But that's not the issue. The issue is whether the officer has—can point to specific, articulable facts when, which taken together with rational inferences from those facts, reasonably warrant an intrusion.

And that does warrant an intrusion. People who are operating a motor vehicle without insurance are a plague upon those who don't, who do have insurance. And just, you know, they're financially irresponsible people, and it's a violation of the law.

And so the officer was justified in making that traffic stop—in making that *Terry* stop, I should say, based on both the window tinting issue but most certainly based on the feedback—considering the totality of the circumstances—based on the feedback that the officer got from the computer regarding the lack of insurance on that vehicle."

¶ 31                                3. *Defendant's Evidence*

¶ 32                                a. Defendant's Testimony

¶ 33     Defendant testified that, prior to being stopped on I-39, he had been driving the vehicle for "maybe two days." He stated that the vehicle belonged to his wife, Dorothy Porter. Defendant testified that he owns a different vehicle, but he was driving his wife's car because his own car was not working. Defendant stated that he drove from Georgia to attend his aunt's funeral in St. Louis, Missouri. After the funeral, he drove his brother home to Rockford, Illinois. When he was stopped by Campbell, he was returning to St. Louis from Rockford. Defendant testified that the entire time he had his wife's car, he never looked in the glove box and had no knowledge that it contained firearms.

¶ 34     On cross-examination, defendant testified that, although he was currently living with his wife, on May 2, 2019, he was living with his sister, about 40 minutes away from his wife's home. Defendant testified that he was never aware that there was a cannabis vape in the center console. He stated that he does not go through his wife's property.

¶ 35     The State then asked defendant, "What was in the bag that was in your buttocks?" Defense counsel objected that the question was beyond the scope of direct examination, and the trial court sustained the objection.

¶ 36                              b. Dorothy Porter

¶ 37     Dorothy Porter testified that defendant was her husband and, in May 2019, she allowed him to drive her car "because his auntie had passed away" and his own car was inoperable. Porter testified that, at the time, she and defendant were not living together and "were on bad terms." Defense counsel asked Porter, "When you let him use your vehicle, did you tell him what was inside your vehicle?" Porter answered, "No. Because all of it happened so suddenly." Defense counsel asked Porter if she was even aware that there was anything in the vehicle when she gave defendant her car. Porter answered that "at the time [her] mind was wandering," she was "with her friends," and it "didn't even cross [her] mind." She stated one gun was a Glock, and she could not remember the make of the second gun. Porter testified that she "literally forgot that my guns were even in that vehicle." Porter stated that she kept her guns in her car because she has a seven-year-old son. She stated she had the requisite license in Georgia to purchase and carry the guns.

¶ 38     On cross-examination, the prosecutor asked Porter if she had her firearms license with her, and she said she did not. She testified that she showed it to defendant's attorney and he told her he did not need a copy of it. Porter also testified that the keys to her car open the glove box. Defendant rested.

¶ 39        4. *The Trial Court's Finding of Guilt and Sentence*

¶ 40        The trial court found defendant guilty of all charges. The court commented on each

offense, beginning with the DWLS, stating as follows:

> "[I]n this case I get this document \*\*\* from the Department of—Georgia
>
> Department of Driver Services, it's called, and it says—has the defendant's name.
>
> It says your license is suspended due to unknown out of state. The effective date of
>
> this was June 28th of 2015. This information is valid, it says at the bottom, of [*sic*]
>
> February 18th, 2021.
>
> Interestingly, it says here that it's suspended for out-of-state activity in the
>
> State of Missouri, the very state to which he is driving.
>
> So I have zero doubt in my mind that at the time that he is operating his
>
> motor vehicle his driver's license was suspended."

¶ 41        The trial court then discussed the gun charges. The court remarked that it was

"clear" and "undisputed" that defendant was a felon and that he was "the sole and exclusive

occupant and operator of the car in which [the] guns were located." Accordingly, the court

observed, the only issue was defendant's knowledge of the guns. The court then discussed its

weighing of the credibility of the witnesses and stated the following:

> "[I]n weighing the credibility of the witnesses a couple things are important
>
> here. One, we have the conviction of the defendant. The court is entitled, and
>
> appropriately so, to take that into account. As a convicted felon his word has less
>
> weight, I suppose, than others. But in—it really—the simple ownership of these
>
> firearms by Ms. Porter doesn't defeat the State's case. That isn't—I mean you
>
> know—the—her assertion of that.

I am somewhat perplexed, and I—by Ms. Porter's testimony in that—you know, I can use my own experiences in life, I suppose. And just as a judge or in life most people that own things know what they are. And she doesn't know what the second gun is. I find that really questionable as to how someone who owns two firearms—you know, and I understand somebody buying a firearm to protect themselves. It's hard to understand buying two firearms to protect yourself. ***

*** [S]o I am concerned, I guess, with Ms. Porter's—with Ms. Porter's testimony a little bit as to her credibility in that she doesn't know the second gun and that there's two guns in there.

But I think the third charge is relevant to the first two. Because, quite honestly, I think that the defense's arguments are somewhat compelling until you get to the third charge. If you say—you know, you say okay, well, maybe it's plausible that he drove *** through numerous states by himself *** and he is wholly, completely ignorant of the fact that there's cannabis in his center console immediately adjacent to him. There is a vape immediately adjacent to him. There's scales in—dealing with dealing, you know. That's what—scale is immediately adjacent to him.

And then right there next to him in the glove box of this Ford Fusion—and not a very big car, as [the prosecutor] has talked about—are two firearms that he is absolutely prohibited from possession. So there is—the constructive possession— or actual possession shows us something about his knowledge, I think, in that sense.

But I think there is a plausible argument up to the point in which we get to the Woodford County jail, and he has a hockey puck up his fanny, and which is not

a place in which people that are not guilty of something carry things. Nobody carries legitimate items in their buttocks ***. *** And he won't turn around, he won't comply.

The officer testified that that's unusual behavior. And so he wouldn't completely turn around. It's a simple command, turn around. And he wouldn't do it. He would turn partly the way one way and turn partly the way the other way, but he wouldn't turn completely around.

So then the officer finally observes this item, and the defendant takes significant action to include blocking off the officer, you know. ***

So if that was just an innocent piece of plastic, that's one thing. But when you block the officer off and prevent him and take significant action to flush something that you've got rammed up your butt down the toilet, there's a reason behind that. And this court wasn't born yesterday. Clearly, you've got a defendant who has a scale found in the car. He's doing something with drugs. What drug? I don't know. Could have been heroin, could have been something. I don't know what it was. And we don't know. Why don't we know what it was? Because he flushed it down the toilet and prevented the officer from getting to it physically. Physically prevented the officer from getting to it.

That comes back to the guns. Because that says something about the guns. The defendant is transporting illegal substances in his butt, and he is transporting guns to protect himself while he does that. I don't buy the fact that he was unaware of what was in that glove box. I don't buy it. He had from Georgia to Missouri to Illinois to the northern border of Illinois, Rockford, and then back to wherever that

20-mile marker, whatever it was. He had the exclusive possession of that car, and that includes those two guns. I find the defendant guilty of all counts."

¶ 42            C. The Defendant's Posttrial Motion and Sentence

¶ 43            In March 2021, defendant filed a motion for a new trial, arguing (1) the trial court erred by denying his motion to suppress, (2) the trial court erred by denying his motions for a directed verdict, (3) the State failed to prove defendant guilty beyond a reasonable doubt of any offenses, (4) the State failed to present evidence that defendant knowingly or constructively possessed the guns in the glove box, and (5) the trial court erred by admitting defendant's Georgia driving record into evidence. The trial court denied defendant's motion.

¶ 44            In August 2021, the trial court sentenced defendant to four years in prison on counts I and II (possession of a weapon by a felon) and two years in prison on count III (obstructing justice), to be served concurrently. The court also sentenced defendant to a concurrent 180 days in jail and $500 fine on the DWLS charge.

¶ 45            This appeal followed.

¶ 46                         II. ANALYSIS

¶ 47            Defendant appeals, arguing (1) the trial court erred by denying his motion to suppress evidence, (2) the trial court erred by considering defendant's 2003 felony conviction to impeach his credibility, (3) the State failed to prove defendant guilty beyond a reasonable doubt, and (4) defense counsel rendered ineffective assistance by failing to file a motion to sever the charges.

¶ 48            Because we agree with defendant's second argument, we reverse defendant's convictions for possession of a weapon by a felon and remand for a new trial solely on those charges. However, we affirm defendant's convictions for obstructing justice and DWLS.

- 14 -

¶ 49          A. The Trial Court's Denial of Defendant's Motion To Suppress

¶ 50          Defendant first argues that the trial court erred by denying his motion to suppress evidence because Campbell lacked a reasonable, articulable suspicion to stop defendant's vehicle. Specifically, defendant contends that neither of Campbell's two stated reasons for stopping defendant's car—(1) illegal window tinting and (2) no insurance—were valid reasons for "stopping a Georgia driver in Illinois." Defendant asserts that, because the initial stop was not justified, all of the evidence gathered as a result of the stop should have been suppressed. Defendant also argues that his trial counsel rendered ineffective assistance by failing to properly argue the motion to suppress.

¶ 51          1. *The Applicable Law and Standard of Review*

¶ 52          Reviewing courts apply a mixed standard of review when examining a ruling on a motion to suppress evidence. *People v. Heritsch*, 2017 IL App (2d) 151157, ¶ 8, 98 N.E.3d 420. The trial court's factual findings are afforded great deference and are reversed only if they are against the manifest weight of the evidence. *Id.* However, the court's ultimate decision to grant or deny the motion is reviewed *de novo. People v. Close*, 238 Ill. 2d 497, 504, 939 N.E.2d 463, 467 (2010).

¶ 53          A vehicle stop constitutes a "seizure" within the meaning of the fourth amendment and is subject to the fourth amendment's reasonableness requirement. *Id.* at 504-05. "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." (Internal quotation marks omitted.) *People v. Hackett*, 2012 IL 111781, ¶ 20, 971 N.E.2d 1058, 1063-64. "[Al]though traffic stops are frequently supported by probable cause ***, the less exacting standard of reasonable, articulable suspicion that justifies an investigative stop *** will suffice for purposes of the fourth amendment

- 15 -

irrespective of whether the stop is supported by probable cause." (Internal quotation marks omitted.) *Id.* at 1064; see also *Close*, 238 Ill. 2d at 505 (police officer had reasonable, articulable suspicion to believe the defendant was driving outside of the terms of his restricted driving permit). A police officer may conduct an investigatory stop when he "can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion." *Id.* (citing *Close*, 238 Ill. 2d at 505).

¶ 54                                    2. *This Case*

¶ 55        As an initial matter, we agree with defendant that the window tint on defendant's car did not serve as a valid basis for the traffic stop. Section 12-503(a-5) of the Illinois Vehicle Code generally prohibits window tint on the windows "immediately adjacent to each side of the driver" unless the tint is light enough to permit 50% or 35% "light transmittance," depending on whether and to what degree the rear windows are tinted. 625 ILCS 5/12-503(a-5) (West 2018). Section 12-503(f), however, explicitly exempts out-of-state vehicles from the statute's purview, stating, in relevant part, that subsection (a-5) "shall not apply to *** those motor vehicles properly registered in another jurisdiction." *Id.* § 12-503(f).

¶ 56        Campbell testified that he ran defendant's license plate before he initiated the traffic stop. Accordingly, Campbell was aware that the vehicle was registered in another state and should have known that the Illinois window tint law did not apply to defendant's car. Thus, Campbell did not have probable cause or reasonable, articulable suspicion to believe a window tint violation had occurred when he initiated the traffic stop on defendant's out-of-state vehicle.

¶ 57        However, we disagree with defendant that Campbell was not justified in stopping defendant's vehicle for an insurance violation. In Illinois, two statutes mandate liability insurance coverage for vehicles operating on roadways; however, the parties address only one: section 3-707

- 16 -

of the Vehicle Code (*id.* § 3-707).

¶ 58　　　　Section 3-707 of the Vehicle Code mandates that "[n]o person shall operate a motor vehicle in this State unless the motor vehicle is covered by a liability insurance policy in accordance with Section 7-601 of this Code." *Id.* § 3-707(a). Defendant cites *People v. Paddy*, 2017 IL App (2d) 160395, 87 N.E.2d 1054, in support of his argument that section 3-707 of the Vehicle Code, like the window tint statute, does not apply to out-of-state vehicles. In *Paddy*, the appellate court indeed held that "a vehicle properly registered [in another state] need not comply with the liability-insurance requirements of the Vehicle Code." *Id.* ¶ 40. The court reasoned that, although section 3-707 broadly prohibits cars from operating in Illinois without liability insurance, it also "adds that only an operator of a motor vehicle subject to registration under the Vehicle Code is subject to a penalty under Section 3-707." *Id.* The court was referring to the language of subsection (c) of section 3-707, which provided the penalty for a violation of subsection (a) of section 3-707.

¶ 59　　　　Subsection (c), at the time the *Paddy* decision was filed in October 2017, read, in relevant part, that "any operator of a motor vehicle *subject to registration under this Code* who is convicted of violating this Section [3-707] is guilty of a petty offense." (Emphasis added.) 625 ILCS 5/3-707(c) (West 2018). Because vehicles properly registered in other states were not subject to registration under the Vehicle Code, the *Paddy* court concluded that the liability insurance requirements of section 3-707 did not apply to out-of-state vehicles. *Paddy*, 2017 IL App (2d) 160395, ¶ 40.

¶ 60　　　　We note that sections 3-707(a) and (c) have been amended since the *Paddy* opinion was filed in October 2017 to explicitly require out-of-state vehicles driving on Illinois roads to be covered by liability insurance. See Pub. Act 100-202 (eff. Jan. 1, 2018) (amending 625 ILCS 5/3-

707(a) to add "in this State"); Pub. Act 102-509 (eff. Jan. 1, 2022) (amending 625 ILCS 5/3-707(c) to add "or under a similar law of another state"). Following Public Act 100-202, section 3-707(a) now reads as follows: "No person shall operate a motor vehicle *in this State* unless the motor vehicle is covered by a liability insurance policy in accordance with Section 7-601 of this Code." (Emphasis added.) 625 ILCS 5/3-707(a) (West 2018). And following Public Act 102-509, section 3-707(c) now reads, in relevant part, "any operator of a motor vehicle subject to registration under this Code, *or under a similar law of another state*, who is convicted of violating this Section [3-707] is guilty of a petty offense." (Emphasis added.) Pub. Act 102-509 (eff. Jan. 1, 2022). Accordingly, as of January 1, 2022, Illinois law clearly applies its liability insurance requirement to out-of-state cars being driven in Illinois. Nonetheless, we recognize that, when defendant was stopped in May 2019, only section 3-707(a) had been amended. The language of subsection (c) that the *Paddy* court construed and relied upon in reaching its conclusion was in effect at the time of defendant's stop.

¶ 61       Nonetheless, neither *Paddy* nor defendant addresses section 7-601 of the Vehicle Code, which is explicitly referred to in section 3-707, and which also requires vehicles being driven in Illinois to be covered by liability insurance. Section 7-601 is found in chapter 7, article VI of the Vehicle Code. Chapter 7 is titled "Illinois Safety and Family Financial Responsibility Law," and article VI is titled "Mandatory Insurance." 625 ILCS 5/ch. 7, art. IV (West 2018). Section 7-601 itself is titled "Required insurance liability policy" and reads, in relevant part, as follows:

> "(a) No person shall operate *** a motor vehicle designed to be used on a public highway in this State unless the motor vehicle is covered by a liability insurance policy.

> \* \* \*

(d) No person shall operate a motor vehicle registered in another state upon the highways of this State unless the vehicle is covered by a liability insurance policy. The operator of the vehicle shall carry within the vehicle evidence of the insurance." *Id.* § 7-601.

¶ 62　　　Importantly, subsection (a) of section 7-601 was in effect at the time *Paddy* was issued, and the language is substantially similar to the language of section 3-707(a) that was in effect at that time. See *id.* § 3-707(a) ("No person shall operate a motor vehicle *in this State* unless the motor vehicle is covered by a liability insurance policy in accordance with Section 7-601 ***." (Emphasis added.)). Accordingly, there is no reason to believe that the *Paddy* court would have reached a different conclusion had it also considered section 7-601.

¶ 63　　　However, after *Paddy* was decided, but before defendant's traffic stop in May 2019, the legislature added subsection (d) to section 7-601, which explicitly required out-of-state vehicles operating on Illinois roadways to be covered by liability insurance and operators of such vehicles to carry proof of said insurance. See Pub. Act 100-828 (eff. Jan. 1, 2019) (amending 625 ILCS 5/7-601 to add subsection (d)). Subsection (d) makes clear that Illinois's liability insurance requirements do apply to out-of-state vehicles being driven on Illinois roadways. Accordingly, we conclude that *Paddy* does *not* govern the outcome of this case.

¶ 64　　　Instead, we conclude that section 7-601 applies, which in May 2019 required that defendant's Georgia vehicle be covered by a liability insurance policy while operating on Illinois roadways. Section 7-601 further required defendant, as the operator of the vehicle, to be carrying proof of liability insurance coverage. Therefore, upon running defendant's Georgia license plate and receiving a response through NCIC from the Georgia authorities that defendant's vehicle was *not* covered by insurance, Campbell had, at a minimum, reasonable, articulable suspicion to

- 19 -

conduct an investigative stop.

¶ 65      We further note that Campbell's reliance on the information he received through NCIC from his squad car computer was reasonable. As the trial court aptly noted, Campbell received his information from a reliable source, not "just some crackpot source of information, you know. He didn't read it in People Magazine." The NCIC response provided Campbell with reasonable, articulable suspicion and probable cause to believe a traffic violation was occurring.

¶ 66      As part of Campbell's investigation into the insurance issue, he obtained defendant's driver's license and learned from the same NCIC source that defendant's Georgia driver's license was suspended. Campbell had probable cause to arrest defendant for DWLS and inventoried the contents of his vehicle prior to towing and impound. During that search, Campbell discovered the guns defendant sought to suppress. Campbell's initial stop of defendant's vehicle was supported by reasonable, articulable suspicion and probable cause, as was his arrest of defendant for DWLS and inventory search of his car. Accordingly, the trial court did not err when it denied defendant's motion to suppress. The court's legal conclusions—that (1) "in this state it is illegal to operate a motor vehicle without insurance" and (2) as a result, Campbell was justified in stopping defendant's vehicle—were correct.

¶ 67      In reaching this conclusion, we reject defendant's argument that Campbell could not rely on the information he received from Georgia regarding defendant's lack of insurance because Illinois does not require Illinois drivers to report their insurance when registering their vehicles. The parties spent considerable time arguing this point, but it is irrelevant. The relevant fact is that Georgia apparently *does* require Georgia drivers to report their insurance when registering their cars and Campbell accessed this information through a reliable police database. Whether he would have the same information on an Illinois driver is irrelevant to our analysis.

Campbell had the information, and he was entitled to act on it.

¶ 68       Defendant also argues that his trial counsel rendered ineffective assistance by "failing to argue that Campbell's stop was improper based on either [*People v. Strawn*, 210 Ill. App. 3d 783, 569 N.E.2d 269 (1991)] or *Paddy* or the relevant sections of the Illinois vehicle code exception out-of-state drivers from Illinois requirements." Defendant's argument fails because none of these suggested arguments would have led to defendant's motion being granted. *Strawn* applies only to the window-tint issue, which we have already determined was not a proper basis for the stop. *Paddy* is inapplicable for the reasons stated (*supra* ¶ 63). And defendant was *not* exempted from Illinois's liability insurance requirement at the time he was stopped. Accordingly, had defense counsel made any of these arguments, defendant's motion would still have failed. "[An attorney] cannot be considered ineffective for failing to make or pursue what would have been a meritless motion or objection." *People v. Rogers*, 2021 IL 126163, ¶ 32, 184 N.E.2d 222; see also *People v. Williams*, 147 Ill. 2d 173, 238-39, 588 N.E.2d 983 (1991) ("[D]efense counsel is not required to undertake fruitless efforts to demonstrate his effectiveness.").

¶ 69                B. The Trial Court's Consideration of Defendant's 2003

Felony Conviction To Impeach His Credibility

¶ 70       Defendant next argues that defendant's convictions for possession of a weapon by a felon (counts I and II) should be reversed because the trial court erred by considering defendant's 2003 felony conviction to impeach defendant's credibility without conducting a *Montgomery* hearing (*People v. Montgomery*, 47 Ill. 2d 510, 268 N.E.2d 695 (1971)). Because defendant forfeited this argument by failing to raise it before the trial court, he requests review under the first prong of the plain-error doctrine. We do so and agree the trial court erred by considering defendant's 2003 conviction to impeach his credibility. Because the evidence was closely balanced

as to whether defendant knowingly possessed the firearms found in the glove box, we reverse defendant's convictions as to counts I and II and remand for a new trial solely on those counts.

¶ 71          1. *The Applicable Law*

¶ 72         a. Forfeiture and the Plain-Error Doctrine

¶ 73    To preserve an error for review, a defendant must both object to the error at trial and raise the error in a posttrial motion. *People v. Sebby*, 2017 IL 119445, ¶ 48, 89 N.E.3d 675. A defendant's failure to do either results in forfeiture of that issue on appeal. *Id.* However, a reviewing court may consider a forfeited argument under the first prong of the plain-error doctrine when (1) a clear or obvious error occurred and (2) the evidence was so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error. *People v. Piatkowski*, 225 Ill. 2d 551, 565, 870 N.E.2d 403, 410-11 (2007). The first step in a plain-error analysis is to determine whether any error occurred at all. *Id.*

¶ 74        b. Impeachment by Prior Conviction

¶ 75    In *Montgomery*, 47 Ill. 2d at 512-13, 519, the Illinois Supreme Court adopted Federal Rule of Evidence 609 (Fed. R. Evid. 609) as "a guide for trial courts in deciding whether a defendant's prior convictions should be admitted to impeach [his] credibility." *People v. Patrick*, 233 Ill. 2d 62, 68, 908 N.E.2d 1, 5 (2009) (citing *Montgomery*, 47 Ill. 2d at 519).

> "Under the '*Montgomery* rule,' evidence of a witness' prior conviction is admissible to attack the witness' credibility when: (1) the prior crime was punishable by death or imprisonment in excess of one year, or involved dishonesty or false statements, regardless of punishment, (2) less than 10 years has elapsed since the date of conviction of the prior crime or release of the witness from confinement, whichever is later, and (3) the probative value of admitting the prior

conviction [substantially] outweighs the danger of unfair prejudice." *Id.* at 68-69 (citing *Montgomery*, 47 Ill. 2d at 516-17).

The supreme court later codified the "*Montgomery* rule" as Illinois Rule of Evidence 609 (eff. Jan. 1, 2011).

¶ 76    "Th[e] last factor [of the *Montgomery* rule] requires a trial judge to conduct a balancing test, weighing the prior conviction's probative value against its potential prejudice." *People v. Mullins*, 242 Ill. 2d 1, 14, 949 N.E.2d 611, 619 (2011). In performing this balancing test, the trial court should consider factors such as (1) the nature of the prior conviction, (2) the nearness or remoteness of that crime to the present charge, (3) the subsequent career of the witness, (4) the length of the witness's criminal record, and whether the crime was similar to the one charged. *Montgomery*, 47 Ill. 2d at 517-18. The prior conviction "must be excluded if the trial court determines that the probative value is [substantially] outweighed by the danger of unfair prejudice." *Patrick*, 233 Ill. 2d at 68.

¶ 77    The *Montgomery* rule applies equally to a bench trial as a jury trial. See *People v. Naylor*, 229 Ill. 2d 584, 610, 893 N.E.2d 653 (2008) (holding the trial court erred at the defendant's bench trial by admitting a felony conviction older than 10 years and stating, "[a] court has no right to override the rules of evidence at trial merely because the case is tried to the court sitting without a jury").

¶ 78                              2. *This Case*

¶ 79                    a. A Clear or Obvious Error Occurred

¶ 80    At defendant's bench trial, the trial court admitted into evidence a certified copy of conviction showing defendant was convicted in December 2003 in Logan County case No. 03CF62 of possession with intent to deliver cannabis, a Class 3 felony, and sentenced to 30 months

of probation. The State was obligated to prove, as an element of counts I and II (possession of a weapon by a felon), that defendant was a felon when he possessed the guns. When the State offered the exhibit, defendant stated he had no objection, and the court admitted the certified copy of conviction. There was no discussion of the certified copy of conviction being used to impeach defendant's credibility.

¶ 81        Nonetheless, when the trial court explained its ruling finding defendant guilty of all charges, it unquestionably considered this prior conviction (the only felony conviction for defendant in the record) when assessing defendant's credibility.

¶ 82        "A trial court will be accorded every presumption it considered only admissible evidence in reaching a conclusion." *People v. Pellegrini*, 2019 IL App (3d) 170827, ¶ 64, 137 N.E.3d 182. That presumption "is rebutted only when it affirmatively appears that: (1) the court considered inadmissible evidence; and (2) that the court was misled or improperly influenced thereby." *People v. Johnson*, 327 Ill. App. 3d 203, 210, 762 N.E.2d 615, 622 (2001); accord *People v. Howery*, 178 Ill. 2d 1, 32, 687 N.E.2d 836, 851 (1997) ("[T]he trial court is presumed to know the law and apply it properly. However, when the record contains strong affirmative evidence to the contrary, that presumption is rebutted.").

¶ 83        In the present case, the trial court remarked, "[I]n weighing the credibility of the witnesses a couple things are important here. One, we have the conviction of the defendant. The court is entitled, and appropriately so, to take that into account. As a convicted felon his word has less weight, I suppose, than others."

¶ 84        Had the trial court conducted a *Montgomery* analysis to determine whether defendant's 2003 felony cannabis conviction was admissible on the issue of his credibility, it could have easily determined that the conviction was not admissible for that purpose because it occurred

18 years prior to his trial. See *Montgomery*, 47 Ill. 2d at 512-13. The *Montgomery* rule establishes a bright-line, temporal rule for the admissibility of prior felony convictions for impeachment purposes: the conviction or release from custody must have occurred within 10 years of the trial.

¶ 85　　　　When the trial court admitted the certified conviction at the close of the State's evidence, it had all the necessary information to ascertain that (1) defendant's conviction was more than 10 years old and (2) defendant was not sentenced to prison. The certified copy of conviction stated both the date of conviction and sentence of probation. Thus, it was readily apparent that defendant's 2003 felony conviction simply did not fall within the parameters of the *Montgomery* rule and should not have been considered by the court to impeach defendant's credibility.

¶ 86　　　　Interestingly, the facts of the present case are similar to those in *Montgomery* itself. There, the supreme court reversed a defendant's conviction for "sale of a narcotic drug" because the prosecution read into evidence a certified copy of conviction of the defendant for robbery, which had occurred 21 years before the trial. *Id.* at 512-13, 519. The court concluded that the prior conviction "bore no rational relationship to the defendant's present credibility, and should not have been admitted." *Id.* at 511.

¶ 87　　　　In the present case, defendant's 2003 conviction occurred 18 years before his trial in 2021. Like in *Montgomery*, the trial court did not correctly apply the law when it relied solely on an 18-year-old felony conviction to declare that defendant's word carried less weight. Important to our analysis is the fact that, after stating that defendant's word carried diminished weight because he was a felon, the trial court gave defendant's testimony no further consideration.

¶ 88　　　　Accordingly, we conclude that the trial court committed a clear and obvious error by considering defendant's felony conviction to impeach his credibility. The fact that defendant's trial was a bench trial rather than a jury trial does not absolve the trial court from following the

*Montgomery* rule and applying the law correctly.

¶ 89   b. The Evidence of Defendant's Knowledge of the Guns Was Closely Balanced

¶ 90   Having concluded that clear or obvious error occurred, we turn to the second step of the first-prong plain-error analysis, which is to determine whether the evidence was "so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error." *Piatkowski*, 225 Ill. 2d at 565. "A reviewing court's inquiry [into whether the evidence was closely balanced] involves an assessment of the evidence on the elements of the charged offense or offenses, along with any evidence regarding the witnesses' credibility." *Sebby*, 2017 IL 119445, ¶ 53.

¶ 91   Because defendant argues only that counts I and II be reversed due to the trial court's *Montgomery* violation, we assess whether the evidence was closely balanced only as to those charges.

¶ 92   Section 24-1.1(a) of the Criminal Code of 2012 (Criminal Code) (720 ILCS 5/24-1.1(a) (West 2018)) provides, in relevant part, that "[i]t is unlawful for a person to knowingly possess on or about his person *** any firearm or any firearm ammunition if the person has been convicted of a felony under the laws of this State or any other jurisdiction."

¶ 93   Defendant concedes that he was a convicted felon at the time he allegedly possessed the two guns in the glove box. Defendant denies, however, that he knowingly possessed those guns. Section 4-2 of the Criminal Code provides that "[p]ossession is a voluntary act if the offender knowingly procured or received the thing possessed, or was aware of his control thereof for a sufficient time to have been able to terminate his possession." *Id.* § 4-2.

¶ 94   The State presented circumstantial evidence that defendant was aware of the guns. Defendant was the sole occupant and driver of a car that contained two handguns in the glove box.

Defendant appeared nervous when stopped and possessed the key to the vehicle, which was needed to unlock the glove box. And the guns were easily accessible once the glove box was opened. At the jail, defendant refused commands to compete a full turn, retrieved an unidentified item from his buttocks, and flushed it down the toilet.

¶ 95  However, defendant denied knowing the guns were in the glove box. He and Porter both testified that he borrowed the car from Porter on short notice to attend his aunt's funeral. They both testified that, although they were married, they were living apart at the time and owned separate vehicles. Porter testified that (1) the guns belonged to her, (2) she had the requisite licenses to own them, (3) she kept them in the car rather than the house to keep them away from her seven-year-old son, and (4) she did not tell defendant about the guns when he borrowed the car.

¶ 96  No physical evidence was presented, such as fingerprints or DNA, that tied defendant to the guns. The evidence was circumstantial, and the outcome of the case turned largely on the trial court's assessment of the credibility of defendant and his witness. Accordingly, we conclude that the evidence concerning defendant's knowledge of the guns was closely balanced.

¶ 97  Because the court's *Montgomery* violation—namely, its improper consideration of defendant's 18-year-old felony conviction as its sole reason to disregard his testimony—threatened to tip the scales of justice in this closely balanced case, we reverse defendant's convictions of possession of a weapon by a felon (counts I and II) and remand for a new trial solely as to those counts.

¶ 98  Because we have determined that the trial court's *Montgomery* violation requires reversal of defendant's convictions on counts I and II, we need not address defendant's additional argument that the trial court improperly considered irrelevant evidence of defendant's conduct at

the jail to support its conclusion that defendant knowingly possessed the guns.

¶ 99    We conclude that the State presented sufficient evidence to sustain defendant's convictions for possession of a weapon by a felon. Accordingly, double jeopardy does not bar a retrial on those charges. *People v. Ward*, 2011 IL 108690, ¶ 50, 952 N.E.2d 601.

¶ 100    C. The Sufficiency of the Evidence as to Obstructing Justice and DWLR

¶ 101    Defendant also argues that the State did not prove him guilty beyond a reasonable doubt of any offense. Because we have determined that the plain-error doctrine requires reversal of defendant's convictions for possession of a weapon by a felon, we address defendant's argument only as it pertains to his obstructing justice and DWLS convictions.

¶ 102    1. *The Applicable Law*

¶ 103    "When a defendant challenges the sufficiency of the evidence, a reviewing court must determine whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original and internal quotation marks omitted.) *People v. Harris*, 2018 IL 121932, ¶ 26, 120 N.E.3d 900. "A conviction will not be reversed on appeal for insufficient evidence unless the evidence is so improbable or unsatisfactory that a reasonable doubt remains as to the defendant's guilt." *Id.*

¶ 104    "A person obstructs justice when, with intent to prevent the apprehension or obstruct the prosecution or defense of any person, he or she knowingly *** [d]estroys, alters, conceals or disguises physical evidence ***." 720 ILCS 5/31-4(a) (West 2018).

¶ 105    A person commits DWLS when he "drives *** a motor vehicle on any highway of this State at a time when such person's driver's license *** is revoked or suspended as provided by this Code or the law of another state." 625 ILCS 5/6-303(a) (West 2018).

¶ 106                          2. *This Case*

¶ 107                          a. Obstructing Justice

¶ 108        Defendant argues that the plain language of the obstructing justice statute requires that the item concealed or destroyed be "physical evidence." Accordingly, defendant contends that because the State "presented no evidence of what the item [defendant flushed] was or how that item could have been of any evidentiary value," the State failed to prove him guilty of obstructing justice.

¶ 109        As the State points out, defendant provides no authority for his proposition that, as a matter of law, the State must (1) identify with specificity the nature of evidence that was concealed, destroyed, disguised, or altered and (2) establish its evidentiary value. The State, on the other hand, points to *People v. Smith*, 337 Ill. App. 3d 819, 786 N.E.2d 1121 (2003), which we find instructive.

¶ 110        In *Smith*, the defendant was serving a sentence of conditional discharge for the offense of obstructing justice when she was stopped by police in a high drug-crime area. *Id.* at 821. After the police officer searched her purse and found no contraband, he then asked the defendant to open her mouth. *Id.* The defendant instead closed her mouth and swallowed. *Id.* When she opened her mouth, the officer saw a white substance on her tongue that he believed to be crack cocaine. *Id.* He was unable to retrieve the substance because the defendant closed her mouth and when she opened it again, the substance was gone. *Id.* at 822.

¶ 111        The State petitioned to revoke the defendant's conditional discharge, alleging that, by swallowing the white substance, the defendant again obstructed justice in violation of section 31-4(a) of the Criminal Code in that, "with the intent to prevent her own apprehension [she] destroyed evidence." (Internal quotation marks omitted.) *Id.* The trial court found the State

proved the allegation. *Id.* at 821. On appeal, the defendant argued that the State failed to prove that the substance she swallowed was a controlled substance. *Id.* at 825.

¶ 112　　　　This court rejected that argument and wrote the following:

"A defendant's state of mind *** can be inferred from proof of the surrounding circumstances. [Citation.] It is not necessary that defendant actually be charged with the underlying offense. [Citation.] The intent to obstruct an individual's defense is not negated by the fact that the suspect is subsequently not charged with a corresponding crime. [Citation.] The fact that an obstruction of justice is successful, the fact that it prevents the prosecution of the underlying offense, does not prevent the prosecution of the obstruction charge." (Internal quotation marks omitted.) *Id.* at 825.

¶ 113　　　　Although *Smith* involved a petition to revoke probation, its reasoning and conclusion apply here. *Smith* instructs that obstructing justice may be proved by circumstantial evidence, which is what occurred in this case.

¶ 114　　　　Similarly, in *People v. Morgan*, 169 Ill. App. 3d 368, 523 N.E.2d 560 (1988), this court affirmed the defendant's conviction for obstructing justice based upon his destruction or concealment of documents that were never recovered. In *Morgan*, a grand jury focusing on obscenity investigations sent a subpoena for documents to the Gentleman's Adult Bookstore. *Id.* at 370. The manager of the bookstore testified that defendant was her supervisor and, after she alerted him to the subpoena, he loaded documents from the bookstore into four boxes and put them in his car. *Id.* The next day, the defendant told the manager that he "had distributed those documents at various rest areas around central Illinois." *Id.* at 371.

¶ 115　　　　On appeal, the defendant argued that "there [was] no proof the documents [he]

removed from the store and concealed were material to the underlying investigation or came within the subpoena." *Id.* This court rejected that argument and stated the following:

> "From the testimony of [the manager], the jury could reasonably find that defendant took the records and concealed them at various rest areas throughout central Illinois to prevent the prosecution of himself or others. The jury could also reasonably infer that the documents so concealed would likely have been used to support the State's case in the underlying obscenity investigation. Why else would the defendant act in the fashion he did? [Citation.] Ironically, had the defendant not concealed them so well, perhaps the documents would have been available at the trial to help support his contentions." *Id.*

¶ 116    The facts of the present case are similar to those in *Morgan*. The item defendant retrieved from his buttocks and flushed was never retrieved or identified. Nonetheless, like in *Morgan*, the trier of fact could infer that defendant behaved the way he did and prevented the police from discovering what he was carrying in his buttocks because it was contraband for which he could be prosecuted.

¶ 117    We conclude that, viewing the evidence in the light most favorable to the State, the elements of obstructing justice were proved beyond a reasonable doubt.

¶ 118                                    b. DWLS

¶ 119    Defendant next argues that the State failed to prove his driving privileges were suspended at the time of the traffic stop because the document from the Georgia Department of Driver Services makes no explicit reference to May 2, 2019. Viewing the document in the light most favorable to the State, we conclude that a rational trier of fact could find beyond a reasonable doubt that defendant's license to drive was suspended on May 2, 2019.

¶ 120 The document is a "Suspension Detail Report" from the "State of Georgia Department of Driver Services" that identifies defendant by name and driver's license number. The document states, "Your License Is Suspended Due to Unknown Out of State, Effective 28-Jun-2015." The caption of the document lists the following dates: (1) "Violation: 28-Jun-2015," (2) "Disposition: 09-Sep-2017," (3) "Reinstate Eligible: 28-Jun-2015," and (4) "Processed: 09-Sep-2017."

¶ 121 The body of the document reads as follows:

"No permit is available for this withdrawal.

To resolve this suspension you must do the following:

1. The State of Missouri has reported that there is a problem with your driving privilege in that state. You must contact Missouri Drivers [*sic*] License Bureau to clear the problem. *** When resolved, contact [Georgia Department of Driver Services] for verification.

2. Wait the required time. You are eligible to reinstate 28-Jun-2015. REQUIREMENT MET."

¶ 122 The document closes by stating, "This information is valid as of 18-Feb-2021."

¶ 123 The document is accompanied by a certification from Tona Harrell, stating she is an administrative assistant and custodian of records for the Georgia Department of Driver Services. Harrell certifies that the record she produced was made by a person with knowledge of the matters contained therein and was kept in the course of regularly conducted activities and practices of the Department.

¶ 124 The trial court found the document admissible as a business record under Illinois Rule of Evidence 803 (eff. Sept. 28, 2018) and a public document not under seal pursuant to Illinois

Rule of Evidence 902 (eff. Sept. 28, 2018). Defendant does not challenge the admissibility of the document on appeal, but instead challenges the substance of the document, arguing that it is ambiguous regarding (1) when the suspension began, and (2) whether defendant had cleared the suspension. Accordingly, defendant contends, the document fails to prove that defendant's license was suspended on May 2, 2019.

¶ 125        Although we agree with defendant that the document is arguably ambiguous about whether the suspension began on June 15, 2018, or September 9, 2017, the document establishes that the suspension began on one of those two dates, both of which precede May 2, 2019. Additionally, the document establishes that defendant's license was still suspended on February 18, 2021, as evidenced by the statements "Your License Is Suspended" and "this information is valid as of 18-Feb-2021."

¶ 126        We disagree with defendant that the document is ambiguous concerning whether he met the requirements for clearing his suspension. First, the "requirement met" language appears only after step 2 of the instructions (the waiting period), and not after step 1 (the instructions to complete reinstatement). This structure makes apparent that the only "requirement met" was that the waiting period to be eligible for reinstatement had passed, not that defendant had completed reinstatement. Second, had defendant cleared his suspension prior to May 2, 2019, it is unlikely that on February 18, 2021, the State of Georgia would generate an official document reporting the status of defendant's license as "Your License is Suspended[.]"

¶ 127        Accordingly, we conclude that, viewing the evidence in the light most favorable to the State, a rational trier of fact could conclude from the document, beyond a reasonable doubt, that defendant's Georgia driver's license was suspended on May 2, 2019.

¶ 128                    D. Defendant's Remaining Argument

¶ 129      Defendant further argues that his trial counsel was ineffective for failing to file a motion to sever counts I and II (possession of a weapon by a felon) from count III (obstructing justice). Defendant contends that the failure to sever the charges prejudiced him because the trial court considered "facts underlying count [III (obstructing justice)] as evidence of [defendant's] knowledge regarding counts [I and II (possession of a weapon by a felon).]" Because we have reversed defendant's convictions on counts I and II and remanded for a new trial on only those counts, we need not address this issue. By affirming defendant's conviction for obstructing justice, we have effectively severed count III from defendant's new trial. If the State seeks to admit evidence of defendant's obstruction of justice as other-crimes evidence at defendant's new trial, the trial court should assess the State's request as it would any other evidentiary matter of that nature.

¶ 130                                III. CONCLUSION

¶ 131      For the reasons stated, we reverse the trial court's judgment as to counts I and II and remand for a new trial solely on those counts. We affirm defendant's convictions for obstructing justice and DWLS.

¶ 132      Affirmed in part and reversed in part.

¶ 133      Cause remanded.

2022 IL App (4th) 210475

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Woodford County, Nos. 19-CF-63, 19-TR-814; the Hon. Charles M. Feeney, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Catherine K. Hart, and Leo Draws, of State Appellate Defender's Office, of Springfield, for appellant. |
| **Attorneys for Appellee:** | Gregory M. Minger, State's Attorney, of Eureka (Patrick Delfino, David J. Robinson, and David E. Mannchen, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |